IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02837-MEH

DAVID SENA,

 Plaintiff,

v.

DEPUTY TYLER BENJAMIN,

 Defendant.
_____

## ORDER
_____

**Michael E. Hegarty, United States Magistrate Judge**.

 Before the Court is Defendant Deputy Tyler Benjamin's Motion for Summary Judgment ("Motion") (ECF 47). The Motion is fully briefed, and the Court finds that oral argument will not materially assist in its adjudication of it. Based on the record herein and for the reasons that follow, the Court **denies** the Motion.

## BACKGROUND

 This case arises out of a dispute regarding an altercation that occurred following a traffic stop. ECF 1 at ⁋ 1. On November 18, 2016, David Sena ("Mr. Sena") was driving a pickup truck that was pulling a flatbed trailer heading southbound on Brighton Road in Commerce City, which is located in Adams County, Colorado. *Id.* at ⁋ 12. Adams County Sheriff's Deputy Tyler Benjamin ("Deputy Benjamin") saw the vehicle, ran a routine registration check, and determined there was no registration record. *Id.* at ⁋ 13. He initiated a traffic stop. *Id.* at ⁋⁋ 13–14. Once pulled over, Mr. Sena exited his vehicle. *Id.* at ⁋ 15–16. As Deputy Benjamin approached Mr. Sena, he noticed a pocketknife on Mr. Sena's person. *Id.* at ⁋ 17. Though the events that occurred

next are disputed, a struggle ensued between Deputy Benjamin and Mr. Sena, in which Deputy Benjamin struck Mr. Sena's face multiple times.  *Id.* at ¶¶ 17–18.  Mr. Sena's remaining claim for relief is brought pursuant to 42 U.S.C. § 1983 for excessive force in violation of Fourth Amendment rights.  *Id.* at ¶¶ 24–38.

## FACTUAL FINDINGS

The Court makes the following findings of fact viewed in the light most favorable to the non-moving party.  However, the Court does not consider evidence submitted by either party which is not material to the Motion, properly objected to, and/or inadmissible.

1.      On November 18, 2016, at approximately 8:17 p.m., Deputy Benjamin observed a Chevrolet truck pulling a flatbed trailer.  Exh. A at 38:11–15, 51:4–10.

2.      Deputy Benjamin ran the license plate of the trailer and found no registration record, which he determined to be a basis for initiating a traffic stop.  *Id.* at 39:17–23.

3.      Mr. Sena was driving the Chevrolet truck and flatbed trailer.  Exh. B at 1, ¶ 5.

4.      Deputy Benjamin was familiar with the area where he encountered Mr. Sena and tried to pull the Chevrolet and trailer over to a safe place that was well lit and where the road shoulder could accommodate the truck and trailer without impeding traffic.  Exh. A at 40:3–8, 177:5–14.

5.      Deputy Benjamin initiated the traffic stop of Plaintiff's vehicle by turning on his patrol vehicle's emergency lights.  *Id.* at 40:3–8, 177:15–20.

6.      Mr. Sena did not immediately pull over.  *Id.* at 40:3–8, 177:15–20.

7.      Deputy Benjamin initially believed that a pile of scrap on the trailer bed may have obstructed Mr. Sena's view of his patrol car's lights, so Deputy Benjamin offset his vehicle by pulling into the adjacent lane.  *Id.* at 43:7–44:11.

8.      Mr. Sena did not initially notice Deputy Benjamin attempting to pull him over.  Exh. 1 at ⁋ 4.

9.      Deputy Benjamin offset his patrol vehicle next to Mr. Sena's, but Plaintiff did not pull over.  Exh. A at 40:9–12.

10.      Deputy Benjamin then shined his patrol vehicle's spotlight into Mr. Sena's mirror and cab of Mr. Sena's truck, but Mr. Sena still did not pull over.  *Id.* at 40:9–12, 177:22–178:14.

11.      While Deputy Benjamin attempted to pull over Mr. Sena, Mr. Sena stopped at a stop sign, proceeded through the stop sign and stopped at a stoplight, waited for the stoplight to turn green and drove through it, and made another turn.  At that point, Deputy Benjamin turned on his sirens.  Mr. Sena still did not pull over.  *Id.* at 40:14–18, 181:11–25.

12.      Deputy Benjamin then pulled his patrol vehicle next to Mr. Sena's truck and made eye contact with Mr. Sena.  Mr. Sena acknowledged Deputy Benjamin by nodding his head.  Mr. Sena did not immediately pull over.  *Id.* at 40:19–22, 178:17–179:1.

13.      Mr. Sena eventually pulled into a gas station parking lot located at 5135 E. 74th Avenue, Commerce City, Colorado.  *Id.* at 44:12–24; Exh. 1 at ⁋ 5.

14.      Even at this point, Deputy Benjamin thought, "[Mr. Sena] might not see me."  Exh. A at 44:25–45:2.

15.      Deputy Benjamin testified that in his experience as a law enforcement officer, most people would have pulled over prior to the point that Mr. Sena did.  *Id.* at 179:6–13.

16.      The gas station Mr. Sena pulled into was a dimly lit area.  *Id.* at 37:19–20.

17.      Mr. Sena exited his vehicle without being asked or commanded to do so by Deputy Benjamin.  Exh. B. at 3.

18.     Deputy Benjamin ordered Mr. Sena to get back into his vehicle, Exh. A at 183:21–25; however, when Mr. Sena then tried to comply, he attempted to get back in but had locked himself out of his vehicle.  *Id.* at 55:10–15; Exh. 1 at ¶ 6.

19.     Mr. Sena asserts that he told Deputy Benjamin that he was locked out of his vehicle.  Exh. 1 at ¶ 9.

20.     Deputy Benjamin testified that he did not learn Mr. Sena locked himself out until after the incident.  Exh. A at 184:1–9.

21.     Deputy Benjamin testified that Mr. Sena's exit from his vehicle raised an alarm for Deputy Benjamin and heightened his awareness of the situation.  *Id.* at 66:2–5, 180:17–181:4.

22.     When Mr. Sena exited his vehicle, he stood next to the driver's side door.  *Id.* at 57:12–17.

23.     Deputy Benjamin testified that Mr. Sena seemed agitated when he exited his vehicle.  *Id.* at 37:20–21.

24.     Deputy Benjamin initially drew his gun but holstered it after he realized Mr. Sena was not approaching him.  *Id.* at 66:6–12.

25.     Deputy Benjamin ordered Mr. Sena to turn around and go down to his knees, but Mr. Sena only turned around.  *Id.* at 66:25–67:10.

26.     Mr. Sena heard Deputy Benjamin's order to go to his knees but chose not to comply.  Exh. D at 3:49-58.

27.      Deputy Benjamin then ordered Mr. Sena to put his hands behind his back, and Mr. Sena complied.  Exh. A at 67:15–19.

28.     Deputy Benjamin testified that Mr. Sena's behavior escalated, and he was acting animated and yelling about being harassed by police.  *Id.* at 180:2–11.

4

29.     Deputy Benjamin testified that he was unsure whether Mr. Sena was going to run away at that point. *Id.* at 66:22–24.

30.     Deputy Benjamin was initially twenty to thirty feet from Mr. Sena. *Id.* at 68:13–16.

31.     Deputy Benjamin approached Mr. Sena and noticed a pocketknife clipped to his right front pants pocket. *Id.* at 74:4–13.

32.     Deputy Benjamin testified that the sight of the pocketknife caused him concern. *Id.* at 75:21–23.

33.     The pocketknife had a thumb assist. *Id.* at 80:10–11.

34.     Deputy Benjamin testified that he reached for Mr. Sena's left arm to place him in handcuffs, but Mr. Sena pulled away and moved his right arm toward the front of his body. *Id.* at 77:1–7, 84:15–20.

35.     Mr. Sena asserts that Deputy Benjamin immediately took him to the ground using a "straight arm bar takedown" without provocation by Mr. Sena. Exh. 1 at ¶¶ 14–15; Exh. A at 86:1–8.

36.     Deputy Benjamin testified that he gave Mr. Sena repeated commands, while on the ground, to put his hands behind his back, but Mr. Sena rolled over onto his back instead of complying. Exh. A at 85:9–25.

37.     Mr. Sena asserts that "[g]iven the shock of having been suddenly taken to the ground, [he] rolled over while the officer was on top of" him. Exh. 1 at ¶ 17.

38.     Deputy Benjamin and Mr. Sena were engaged in an active struggle on the ground. Exh. B at 3.

39.     Deputy Benjamin struck Mr. Sena in the face multiple times. Exh. A at 190:15–24; Exh. 1 at ¶ 18.

40.     Even after the strikes to the face,  Deputy Benjamin was not able to completely restrain Mr. Sena.  Exh. A at 192:6–12.

41.     Adams County Sheriff's Deputy Julie Sedillo ("Deputy Sedillo") arrived on scene and assisted Deputy Benjamin in trying to gain control of Mr. Sena.  Deputies Benjamin and Sedillo were on the ground trying to put Mr. Sena in handcuffs.  *Id.* at 85:18–21, 191:8–16.

42.     Adams County Sheriff's Deputy Chad Jenkins ("Deputy Jenkins") also arrived on scene and witnessed the struggle between Mr. Sena and Deputies Benjamin and Sedillo.  *Id.* at 85:22–25, 191:17–192:5.

43.     Deputy Jenkins assisted Deputies Benjamin and Sedillo in the struggle and tased Mr. Sena. *Id.* at 191:17–192:5; Exh. B at 3.

44.     It took all three Deputies on scene and the use of a taser to get Mr. Sena handcuffed.  Exh. B at 3.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the

nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, i.e., the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005).

## ANALYSIS

Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is an entitlement not to stand trial or face the other

burdens of litigation. *Ahmad v. Furlong,* 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted). The privilege is an immunity from suit rather than a mere defense to liability. *Id.*

Deputy Benjamin asserts he is entitled to qualified immunity on the claim against him in his individual capacity. The defense of qualified immunity requires that "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1169 (10th Cir. 2020). When a defendant asserts the defense of qualified immunity at summary judgment, the burden shifts to the plaintiff to overcome the asserted immunity. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). The Supreme Court in *Pearson v. Callahan* emphasized that courts have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. 223, 236 (2009); *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

In overcoming qualified immunity for excessive force, a plaintiff must establish a violation of his Fourth Amendment rights. "Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment." *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). [1] "To determine whether the force used in a particular case is excessive 'requires a careful balancing of the nature and quality

---

[1] The Court acknowledges that in the Tenth Circuit, "the reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Estate of Valverde by & through Padilla v. Dodge,* – F.3d –, 2020 WL 4362095, at *11 (10th Cir. July 30, 2020). In this case, there are no allegations of any reckless or deliberate conduct by Deputy Benjamin creating the need for force. As such, the Court does not address that part of the analysis .

of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Casey v. City of Federal Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007) (quoting *Graham*, 490 U.S. at 396).   This requires the Court to engage in a balancing test, taking into account "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Here, in determining whether Mr. Sena has met his burden of establishing constitutional violations that were clearly established, the Court construes the facts in the light most favorable to him as the non-moving party.   *Scott*, 550 U.S. at 378.   At summary judgment, the litigation is beyond the pleading phase; thus, a plaintiff's version of the facts must be supported by the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).   That is, "as with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Id.* (citations and quotations omitted).

Consequently, the Court will examine first the factual basis for Deputy Benjamin's alleged violation of Mr. Sena's constitutional rights.   The Court will then proceed to determine whether the right was clearly established at the time of the alleged conduct.

## I.   Factual Basis

### A.   Severity of the Crime

On the first *Graham* factor, there is no dispute that the severity of the crime alleged is minimal.   Deputy Benjamin testified that the only reason he stopped Mr. Sena was for lack of a record on the license plate.   Exh. A at 39:17–23, 62:9–12.   Deputy Benjamin also conceded that

lack of registration is a minor infraction.  Exh. A at 62:13–63:4.  A routine traffic violation is not a severe crime; thus, this first *Graham* factor favors Mr. Sena.

B.   <u>Whether the Suspect Poses an Immediate Threat to the Safety of the Officers or Others</u>

In assessing the degree of a threat facing officers, a court may consider:  "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).  Moreover, "[t]he reasonableness of an officer's conduct must be assessed from the perspective of a reasonable officer on the scene . . . [who] may be forced to make split-second judgments under stressful and dangerous conditions."  *Walker v. City of Orem*, 451 F.3d 1139, 1159 (10th Cir. 2006).

1.   Compliance with Officer's Orders

Despite disagreement between the parties on some aspects of the incident, there are several undisputed facts regarding Mr. Sena's compliance with Deputy Benjamin's orders.  There is no dispute that Deputy Benjamin ordered Mr. Sena to turn around and put his hands behind his back. Exh. A at 66:25–67:14.  There is also no dispute that Mr. Sena complied with both of those orders. *Id.* at 67:8–17.  Also, it is undisputed that Mr. Sena had a visible pocketknife on his person.  Exh. 1 at 2.  Deputy Benjamin saw the pocketknife as he approached Mr. Sena.  Exh. A at 74:4–13.  He noticed that the pocketknife had a thumb assist which, in his estimation, made it easy to open. Exh. A at 80:10–11.  However, there is no evidence in the record suggesting Deputy Benjamin ever ordered Mr. Sena to remove the pocketknife.

Although the parties present opposing arguments as to whether Deputy Benjamin ordered Mr. Sena to get down on his knees, the evidence demonstrates there is no genuine dispute.  Deputy

Benjamin testified that he ordered Mr. Sena to "go down to his knees." Exh. A at 67:3–14. Mr. Sena counters that Deputy Benjamin "did not tell [him] to get down on [his] knees. [He] would have complied with such an order had it been given." Exh. B at 2, ¶ 11. However, Deputy Benjamin has provided evidence of a telephone call made by Mr. Sena from the Adams County Detention Facility in which Mr. Sena admits Deputy Benjamin did in fact order him to go to his knees. *See* Exh. D. Mr. Sena stated, "I was cooperating with them except for . . . [inaudible] . . . wanted me to kneel; I wouldn't kneel." Exh. D (audio recording) at 3:49–58. "When an otherwise inadmissible hearsay statement is made by a party-opponent, . . . it may be admitted under Rule 801(d)(2)." *Oaster v. Robertson*, No. 15-cv-00871-KLM, 2016 WL 126291, at *1 (D. Colo. Jan. 11, 2016). Because Mr. Sena made this statement against his interest, the Court may properly consider it as evidence. *See Daviscourt v. Columbia State Bank*, 2008 WL 1806192, at *2 (D. Colo. April 21, 2008) ("[E]vidence considered by the court in ruling on a motion for summary judgment must be evidence that is admissible at trial."). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting *Scott*, 550 U.S. at 380). Considering Mr. Sena's admission, there is no genuine dispute that Mr. Sena failed to comply with Deputy Benjamin's order to get to his knees.

The crux of the parties' dispute in this case is whether Mr. Sena complied with Deputy Benjamin's orders when the deputy approached Mr. Sena. Deputy Benjamin asserts that he attempted to place Mr. Sena in handcuffs, but Mr. Sena refused to comply. Exh. A at 67:1–14. Mr. Sena contends that Deputy Benjamin simply used an arm bar takedown maneuver on him without provocation. Exh. 1 at ¶¶ 14–15; Exh. A at 86:1–8. There is no video of the incident in

the record, and no other objective measure by which this Court may ascertain the exact events that transpired. At the summary judgment stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986). Moreover, when viewing the evidence in the light most favorable to Mr. Sena, there is evidentiary support for his claim. Accordingly, the Court finds there are material issues of fact as to the full extent of Mr. Sena's compliance or noncompliance with Deputy Benjamin's orders. *See Estate of Smart by Smart*, 951 F.3d at 1169.

2.      Hostile Motions

Deputy Benjamin asserts that when Mr. Sena exited his vehicle, he "seemed very agitated." Exh. A at 37:20–21. In fact, Deputy Benjamin testified that Mr. Sena's behavior "escalated" into becoming "very animated" and "yelling . . . about being harassed by police." Exh. A at 180:2–11. Mr. Sena does not directly dispute these allegations but states that "[a]t no time did [he] threaten [Deputy Benjamin] in any way, or make any motion that could be taken as threatening." Exh. 1 at ¶ 13. Deputy Benjamin asserts that when he approached Mr. Sena and saw the pocketknife, he reached for Mr. Sena's left arm so as to place him in handcuffs, but Mr. Sena pulled his left arm away and moved his right arm toward the front of his body. Exh. A at 77:1–7, 84:15–20. Mr. Sena denies this happened and maintains that Deputy Benjamin simply slammed him to the ground without provocation. Exh. 1 at ¶¶ 14–15.

As is the case with Mr. Sena's compliance with Deputy Benjamin's orders, a material factual dispute exists regarding any hostile motions made by Mr. Sena. When viewed in the light most favorable to Mr. Sena, the Court finds there is no clear indication in the record of what occurred, other than the conflicting testimony of both parties. Therefore, the Court cannot find on

the record that Mr. Sena made any definitive hostile motions.  That is a determination best left for the jury to decide.  *See Estate of Smart by Smart*, 951 F.3d at 1169 (Whether a reasonable jury "could find facts supporting a violation of a constitutional right . . . turns on whether there exists a genuine dispute as to any material fact.").

3.      Distance

On the issue of the distance between the parties, there is no genuine dispute.  Deputy Benjamin was initially twenty to thirty feet away from Mr. Sena.  Exh. A at 68:13–16.  Although the record does not specify, the Court can assume based on Deputy Benjamin's ability to use a takedown maneuver on Mr. Sena when the altercation occurred, the parties were only mere feet away from each other at the time the physical altercation occurred.

4.      Manifest Intentions

Deputy Benjamin initiated the traffic stop of Mr. Sena's vehicle by turning on his patrol vehicle's emergency lights.  Exh. A at 40:3–8, 177:15–20.  Mr. Sena did not immediately pull over.  *Id*.  Mr. Sena's trailer bed had a pile of scrap on it that Deputy Benjamin initially believed may have obstructed Mr. Sena's view of his patrol car's lights.  *Id.* at 43:7–44:11.  Deputy Benjamin then offset his vehicle to try and get Mr. Sena's attention.  *Id*.  Mr. Sena argues that he did not notice Deputy Benjamin attempting to pull him over.  Exh. 1 at ¶ 4.  With Mr. Sena still not having pulled over, Deputy Benjamin shined his patrol vehicle's spotlight into Mr. Sena's mirror and the cab of Mr. Sena's truck.  Exh. A at 40:9–12, 177:22–178:14.  Mr. Sena still did not pull over.  *Id.* at 40:9–12, 177:22–178:14.  While Deputy Benjamin attempted to pull over Mr. Sena, Mr. Sena continued to drive by stopping at a stop sign, proceeding through the stop sign and stopping at a stoplight, going through the stoplight, and making another turn.  *Id.* at 40:14–18,

181:11–25.  At that point, Deputy Benjamin turned on his siren.  Mr. Sena still did not pull over.

*Id.*

Deputy Benjamin then pulled his patrol vehicle next to Mr. Sena's truck and made eye contact with Mr. Sena.  *Id.* at 40:19–22, 178:17–179:1.  Mr. Sena acknowledged Deputy Benjamin by nodding his head.  *Id.*  However, Mr. Sena did not immediately pull over.  *Id.*  Instead, he continued down the road and pulled into a dimly lit, gas station parking lot located at 5135 E. 74th Avenue, Commerce City, Colorado.  *Id.* at 37:19–20, 44:12–24; Exh. 1 at ¶ 5.  Deputy Benjamin testified that in his experience as a law enforcement officer, most people would have pulled over prior to the point that Mr. Sena pulled over.  Exh. A at 179:6–13.  However, even at this point, Deputy Benjamin testified that he thought Mr. Sena took so long to pull over because he might not have seen Deputy Benjamin.  *Id.* at 44:25–45:2.  Once pulled over, Mr. Sena exited his vehicle without being asked or commanded to do so by Deputy Benjamin.  Exh. B. at 3.  As mentioned above, there is a genuine dispute regarding the events that occurred after Mr. Sena pulled over and Deputy Benjamin approached him.

The record is clear that Mr. Sena did not immediately pull over for Deputy Benjamin; in fact, the evidence demonstrates Mr. Sena continued to drive for some length of time before pulling over into a dimly lit area.  Moreover, Mr. Sena admits he exited his vehicle without being asked to do so.  All of these actions certainly could cause a reasonable officer to question Mr. Sena's intentions.  However, Deputy Benjamin testified that he believed Mr. Sena may have not pulled over because he could not see his vehicle.  Exh. A at 44:25–45:2.  Further, when Deputy Benjamin ordered Mr. Sena to get back into his vehicle, Mr. Sena attempted to comply but had locked himself out of the truck.  *Id.* at 55:10–15; Exh. 1 at ¶ 6.  Finally, as mentioned earlier, there are questions

14

regarding exactly what actions the parties took when Deputy Benjamin approached Mr. Sena and tried to place him in handcuffs. *See supra* at 11–12.

Keeping in mind that the Court must determine "whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force," the record is not definitive on Mr. Sena's manifest intentions. *Estate of Larsen*, 511 F.3d at 1260. When the evidence is viewed in the light most favorable to Mr. Sena, the Court finds that conflicting testimony and evidence create genuine issues of material fact regarding this issue.

C.     Whether Mr. Sena Actively Resisted Arrest or Attempted to Evade Arrest by Flight

The issue of whether Mr. Sena actively resisted arrest is similar to the issue of compliance with Deputy Benjamin's order; that is, this factor primarily hinges on what events transpired immediately after Deputy Benjamin approached Mr. Sena. Deputy Benjamin contends that he attempted to place Mr. Sena in handcuffs after seeing a pocketknife on Mr. Sena, but that Mr. Sena refused to be put in handcuffs. Exh. A at 67:1–14. Mr. Sena argues that Deputy Benjamin simply took him to the ground without provocation. Exh. 1 at ¶¶ 14–15.

Once Mr. Sena was on the ground, though, the record is clear that a struggle ensued. Deputy Benjamin maintains that he gave Mr. Sena multiple commands to put his hands behind his back, but he rolled over onto his back instead. Exh. A at 85:9–25. Mr. Sena denies Deputy Benjmain gave him any orders while on the ground but admits that "[g]iven the shock of having been suddenly taken to the ground, [he] rolled over while [Deputy Benjamin] was on top of" him. Exh. 1 at ¶ 17. Then, Deputy Benjamin struck Mr. Sena in the face multiple times. Exh. A at 190:15–24. Deputy Benjamin claims he did this because Mr. Sena's face was the only target available for him to try and control Mr. Sena during the struggle. *Id*. Mr. Sena admits becoming agitated after being struck in the face multiple times. Exh. 1 at ¶¶ 14–18. While the conflict continued, Deputy

15

Sedillo arrived on scene and aided Deputy Benjamin.  Exh. A at 85:18–21, 191:8–16.  Presumably, both deputies were unable to completely subdue Mr. Sena, because Deputy Jenkins also arrived on scene to assist.  *Id.* at 85:22–23, 191:17–25.  Deputy Jenkins used a taser on Mr. Sena, after which the deputies were able to handcuff him.  *Id*. at 85:22–25, 191:17–192:5.

Given that it took three deputies and a taser to finally subdue Mr. Sena, there is a strong argument that he resisted arrest once he was on the ground.  However, the question of whether Mr. Sena initially resisted arrest is disputed.  As already mentioned, when viewed in the light most favorable to Mr. Sena, the record demonstrates genuine disputes as to material facts that will need to be addressed by the trier of fact.

D.      Weighing the Factors

 Considering all three *Graham* factors, the Court has found only the first (*i.e.*, severity of the crime) as definitely weighing in favor of Mr. Sena.  As to the other two (*i.e.*, immediate threat and resisting arrest), the Court has found genuine factual disputes which need to be decided by the jury.  Therefore, considering the totality of the circumstances and viewing the evidence in the proper light, the Court finds the balance of the *Graham* factors weigh against finding summary judgment as to the first prong of the qualified immunity defense.  *See Estate of Smart by Smart*, 951 F.3d at 1169 ("[I]f the record shows an unresolved dispute of historical fact relevant to the immunity analysis, a motion for summary judgment based on qualified immunity should be properly denied.").

II.      **Clearly Established Law**

For the second prong of the qualified immunity analysis, Mr. Sena must identify clearly established law supporting a claim that Deputy Benjamin knew his conduct was unconstitutional; therefore, the Court must address whether such clearly established law exists.  Mr. Sena points to

three cases in his Complaint as establishing a clear constitutional right applicable to his case. *See* Compl. at 6, ¶ 34; *Lee v. Tucker*, 16-cv-01569-NYW, 2017 WL 2839650 (D. Colo. 2017); *Mwangi v. Norman*, 16-cv-00002-CMA-NYW, 2016 WL 7223270, at *45 (D. Colo. 2016); *Simmons v. Hinton*, 13-cv-02566-CMA-MJW, 2015 WL 1041583 (D. Colo. 2015). The Court already found these cases inapplicable. *See* Order, ECF 34 at 11. As to *Lee* and *Mwangi*, those cases were decided after the events in this case; therefore, they cannot be used to support a conclusion that Deputy Benjamin violated clearly established law at the time. Regardless, all three cases cited by Mr. Sena are unpublished district court decisions that cannot adequately demonstrate that a law was clearly established. *See Morris v. Noe*, 672 F.3d 1185, 1197 n.5 (10th Cir. 2012) ("[A] single unpublished district court opinion is not sufficient to render the law clearly established.").

In his Response, Mr. Sena points also to *McCoy v. Meyers*, 887 F.3d 1034 (10th Cir. 2018), *Dixon v. Richer*, 922 F.2d 1456 (10th Cir. 1991), and *McCowan v. Morales*, 945 F.3d 1276 (10th Cir. 2019). [2] At the motion to dismiss stage, this Court already found *McCoy* supported Mr. Sena's position. In *McCoy*, the Tenth Circuit determined that several officers' conduct in which they continued to strike a suspect who had already been subdued and restrained was so clearly a violation of the Fourth Amendment that the defendant was not entitled to qualified immunity. *McCoy*, 887 F.3d at 1052–53.

In *Dixon*, a law enforcement officer pulled over two individuals ("Dixons") on suspicion that a different person who had committed a crime was present in their vehicle. 922 F.2d at 1458. Upon being pulled over, the Dixons exited their vehicle and began to walk toward the officer's car. *Id.* The officer initially drew his handgun and pointed it at the Dixons, until one of them

[2] *McCoy* and *McCowan* were decided after the events at issue here; however, the Tenth Circuit in both cases relied on the relevant principle from *Dixon*. Accordingly, the Court may consider whether the principle in *McCoy*, *McCowan*, and *Dixon* is clearly established.

identified himself as a Department of Corrections officer ("Mr. Dixon"). *Id.* The officer holstered his gun but ordered Mr. Dixon to "[g]et up against the" vehicle. *Id.* Mr. Dixon complied by putting his hands against the vehicle. *Id.* The officer ordered Mr. Dixon to spread and move his legs backward so the officer could frisk him. *Id.* The officer then kicked Mr. Dixon "in the instep." *Id.* The officer continued to frisk Mr. Dixon until the officer left to go call for backup. *Id.* When backup arrived, the frisk resumed with another kick to Mr. Dixon's instep. *Id.* This kick caused Mr. Dixon to start to fall, at which point the officer hit Mr. Dixon "in the stomach with a metal flashlight." *Id.* Once Mr. Dixon had completely fallen to the ground, the officer and his backup "got on top of [Mr. Dixon] and began to beat and choke him." *Id.* Based on these facts, the Tenth Circuit held that the officer had violated a clearly established constitutional right. *Id.* at 1461–62.

In *McCowan*, an officer pulled over an individual ("McCowan") for driving without headlights. 945 F.3d at 1280. The officer saw evidence of impairment due to alcohol. *Id.* The officer administered a sobriety test to McCowan, who performed poorly. The officer then handcuffed McCowan. *Id.* McCowan complained about the tightness of the handcuffs and wanted them forward facing to avoid aggravating an alleged shoulder injury. *Id.* After being placed in the back of the patrol car, the officer allegedly did not secure McCowan with the seatbelt. *Id.* This combined with alleged reckless driving by the officer caused McCowan to be "repeatedly slammed throughout the backseat like a ping pong ball," further injuring McCowan's shoulder *Id.* (internal quotations omitted). Later, when McCowan was in his cell, the officer entered the cell, loosened the handcuffs after McCowan's wrists turned purple, and ordered McCowan to stand up straight. *Id.* McCowan could not stand up due to his pain, so another officer came into the cell to pull McCowan to his feet. *Id.* at 1281. When the officers pulled on McCowan, they caused an audible

tear in McCowan's shoulder.  *Id.*  The Tenth Circuit held that "the constitutional violation at issue under McCowan's excessive force claim was indeed clearly established."  *Id.* at 1282.

Mr. Sena argues that the principle that arises from these cases is that "the Fourth Amendment prohibits the use of force without legitimate justification, as when a subject poses no threat or has been subdued."  *McCowan*, 945 F.3d at 1289 (quoting *McCoy*, 887 F.3d at 1052).  The Court agrees.  If Mr. Sena's version of events are determined to be true by the trier of fact, Deputy Benjamin slammed him to the ground without any provocation while Mr. Sena had his hands behind his back.  A similar situation occurred in *Dixon*, because Mr. Dixon had his hands against a vehicle when the officer inflicted force against him.  Likewise, in *McCowan*, the injured party had handcuffs on when officers pulled him from the ground, tearing his shoulder.  If a jury believes Mr. Sena's account, Mr. Sena had his hands behind his back and posed no immediate threat to Deputy Benjamin prior to being slammed on the ground.  Accordingly, in light of *Dixon, McCoy,* and *McCowan*, the Court finds there is a clearly established law for Mr. Sena's excessive force claim, if a jury determines the facts in favor of him.  Therefore, as a matter of law, summary judgment is inappropriate.

## CONCLUSION

Accordingly, Defendant Deputy Benjamin's Motion [filed May 20, 2020; ECF 47] is **denied**.  Genuine factual disputes exist concerning come critical events at issue between Mr. Sena and Deputy Benjamin, precluding summary judgment.

SO ORDERED.

Dated this 3rd day of August, 2020, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge